ORDERED.

Dated:  June 29, 2026

Lori V. Vaughan
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re | ) |
| | ) |
| Phil Kean Designs Inc, | ) Case No. 6:25-bk-07667-LVV |
| | ) Chapter 11 |
| Debtor. | ) Subchapter V |
| | ) |

**MEMORANDUM OPINION ON CONFIRMATION OF
DEBTOR'S FINAL CHAPTER 11 SUBCHAPTER V PLAN OF REORGANIZATION**

A key benefit of subchapter V of chapter 11 is that a debtor may confirm a plan without the affirmative vote of its creditors, but only if the plan is fair and equitable which requires devotion of its projected disposable income over the plan term. Debtor seeks to take advantage of this cramdown provision, but faces the objection of creditors Daniel and Patricia Stasny (collectively "Creditors" or "Stasnys"). Creditors assert debtor's plan pays too little over too short a period to be fair and equitable despite inclusion of a true-up mechanism that would potentially pay them more. Because debtor has demonstrated that the plan devotes its projected disposable income over the life of the plan, and there is no justification for extending the plan term, the Court overrules Creditors' objection.

1

**Background Facts**

Phil Kean Designs Inc. ("Debtor") is part of the Phil Kean Design Group—a group of Florida companies that provide design and construction services for custom, luxury homes.[1] Debtor is the construction arm of the group.[2] Debtor's Chief Executive Officer, Philip Kean, holds a 50% ownership interest in the company, while its Vice President, Bradley Grosberg, owns the remaining 50%.[3]

Debtor filed a voluntary petition for relief under chapter 11, subchapter V of the Bankruptcy Code on November 25, 2025 following a prolonged contract dispute with a former client.[4] Although the $1.3 million arbitration award initially entered against Debtor in that dispute was later vacated, litigation costs significantly impaired Debtor's liquidity and disrupted its business operations resulting in this bankruptcy.[5] Debtor filed its Subchapter V Plan of Reorganization on February 16, 2026 which provided for payment of Debtor's projected disposable income over three years based on attached projections.[6] This initial plan drew objections from homeowners asserting construction defect claims, including, Tim and Petra Holt (collectively "Holts"), William C. Bray and Christine A. Bray (collectively "Brays") and the Stasnys (together, the "Homeowners").[7] After some negotiations, Debtor amended its plan to provide for distribution of its surplus income in an effort to resolve the objections raised by the Homeowners.[8] The Holts and Brays withdrew their objections.[9] This and other changes were

---

[1] None of the other entities associated with Phil Kean Design Group are part of this bankruptcy.
[2] *Id*.
[3] *Id.*
[4] *Id*.
[5] *Id*.
[6] Doc. No. 71.
[7] Doc. Nos. 95, 98, 100.
[8] Doc. No.101.
[9] Doc. Nos. 103, 106.

incorporated into Debtor's Final Chapter 11 Subchapter V Plan ("Plan") which Debtor seeks to confirm.[10] Debtor's plan amendments did not resolve the objection of the Stasnys, who later filed a supplement (collectively "Objection").[11]

Debtor's Plan divides claims and interests into five classes.[12] Classes 1 and 2 comprise the allowed secured claims of Cogent Bank, which are unimpaired. Class 2(a) consists of the allowed secured claim of Golden Oak which is likewise unimpaired.[13] As unimpaired classes, these secured creditors are presumed to accept the Plan under § 1126(f).[14] Class 3 consists of all allowed general unsecured claims, the majority of which consist of claims by the Homeowners for alleged construction defects.[15] Class 4 consists of equity interests, which are likewise unimpaired and presumed to accept the Plan.[16]

Debtor's Plan proposes to pay unsecured creditors, *pro rata*, its projected disposable income over three-years for a total distribution of $91,217.76, paid in quarterly distributions.[17] The Plan also requires Debtor to remit its "Surplus Income" to unsecured claimants on a semiannual basis.[18] The Plan defines "Surplus Income" as "the amount by which Debtor's actual disposable income exceeds Debtor's projected disposable income for such period as set forth in the Plan's financial projections attached thereto."[19] Debtor must submit quarterly financial statements to support this calculation. Entitlement to such payment, however, is expressly conditioned upon a

---

[10] Doc. No. 102.
[11] Doc. Nos. 98, 110. The Objection was filed on March 18, 2026 and supplemented on March 24, 2026.
[12] Debtor's Exh.1, Plan at Article III - Classification of Claims and Interests.
[13] *Id*.
[14] 11 U.S.C. §1126(f) provides "Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required."
[15] Debtor's Exh.1, Plan at Article III - Classification of Claims and Interests.
[16] *Id*.
[17]  Debtor's Exh. 1, Plan at Exh. A.
[18] *Id.*
[19] *Id.*

showing that applicable insurance coverage is insufficient to satisfy the full amount of an allowed construction defect claims.[20] If triggered, the Surplus Income will be shared *pro rata* by all unsecured creditors.

The Court held a trial on March 25, 2026, to consider confirmation of the Plan and Creditors' Objection.[21] At trial, the Court admitted into evidence, without objection, Debtor's exhibits including its operating projections (the "Projections").[22] The Court also heard testimony from Debtor's president, Tommy Watkins ("Watkins"). Debtor's Plan will be funded out of the continued operation of its construction business. Debtor projects total income of $2,440,642.17 in year one, $2,485,115.01 in year two, and $2,530,477.31 in year three.[23] The Projections reflect a slight upward trend over the life of the Plan, with total income increasing by 2%, health insurance expenses by 5%, and other expenses by 3% to account for annual wage increases.[24] Insiders, Philip Kean and Bradley Grosberg, are not receiving any compensation or distributions from the reorganized Debtor during the Plan term.[25]

Watkins addressed the discrepancies between the Projections and Debtor's schedules. He explained that the $11,700,000.00 figure in Debtor's Statement of Financial Affairs reflects the firm's total gross revenue for 2025. The $2,223,642.17 income figure is the builder fee, calculated as 20% of total revenue, which reflects gross profit.[26] Debtor typically undertakes six to eight new construction projects in a year, which could generate gross revenue of approximately $30 million,

---

[20] *Id.*

[21] Doc. No. 119.

[22] Debtor's Exh.1, Plan at Exh. A.

[23] *Id*.

[24] *Id*.

[25] Debtor's Exh.1, Plan at Article V – Treatment of Impaired and Unimpaired Classes.

[26] The $2,223,642.17 figure in the Projections does not represent Debtor's total income; it refers specifically to the "New Construction" income category. The $2,440,642.17 figure in the Projections represents Debtor's total projected income.

4

however, its income is limited to the 20% builder fee. Watkins further explained that Debtor does not receive project payments in a lump sum, but is paid in phases as construction progresses. Under this fee arrangement, Debtor is expected to realize approximately $2.2 million in annual income. During re-direct examination, Watkins testified how the bankruptcy filing negatively affected Debtor's business. Debtor recently lost a project valued at approximately $10 million due to the uncertainty of the pending bankruptcy. Watkins also expects the number of new construction projects to decline to four to six per year due to an industry-wide market slowdown.

### Discussion

The dispute in this case centers around Debtor's payment of projected disposable income under the Plan. Debtor is not eligible to confirm the Plan as consensual under § 1191(a) having not received the vote of all impaired classes of creditors as required by § 1129(a)(8).[27] Still, Debtor may confirm the Plan under the cramdown provisions of § 1191(b) if the plan is fair and equitable with respect to each impaired, nonaccepting class. To satisfy the requirement that a plan be fair and equitable with respect to each class, Debtor must show that:

> As of the effective date of the plan—
>
> (A) the plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or…

11 U.S.C. § 1191(c)(2)(A).

---

[27] While a majority of the number of holders of allowed claims in Class 3, the only impaired class, voted to accept the Plan, less than two-thirds in amount voted to accept the Plan, failing to meet the requirements of § 1126(c).

Section 1191(d) defines "disposable income" as:

> For purposes of this section, the term 'disposable income' means the income that is received by the debtor and that is not reasonably necessary to be expended—
>
> …
>    (2) for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor.

11 U.S.C. § 1191(d). Debtor bears the burden of proving, by a preponderance of the evidence, that its Plan satisfies each element necessary for confirmation. *In re Legacy Pools LLC*, Case No. 6:22-bk-03123-LVV, 2024 WL 4209577, at *3 (Bankr. M.D. Fla. Sept. 16, 2024) citing *In re Stein Mart, Inc.*, 629 B.R. 516, 522 (Bankr. M.D. Fla. 2021).

Creditors argue the Plan is not fair and equitable under § 1191(b) because Debtor is underestimating its projected disposable income. Debtor responds the Plan pays projected disposable income as required by § 1191(c) and that, in any event, inclusion of the Surplus Income provision cures any deficiency by increasing the payment to creditors if Debtor's actual disposable income exceeds its projections. Debtor's Surplus Income is akin to what many courts have termed a true-up – a mechanism to adjust payments under a plan when a debtor's actual net disposable income exceeds its projections. Debtor's argument raises the question of what role a true-up plays, if any, in confirmation of a plan under § 1191(b) when the statute expressly requires projected disposable income.

Bankruptcy courts outside this jurisdiction have examined the relationship between § 1191(b) and true-up mechanisms, focusing on two similar questions: First, whether § 1191(b) of the Bankruptcy Code requires a true-up in addition to projected disposable income; and second, whether a bankruptcy court has the authority to require a true-up. In *Packet Construction*, the subchapter v trustee argued that the debtor must include a true-up for the plan to be fair and

6

equitable. *In re Packet Constr., LLC*, 672 B.R. 905, 906 (Bankr. W.D. Tex. 2024). The court overruled the objection reasoning that by requiring a debtor devote projected disposable income, § 1191(b) mandates a forward-looking analysis. *Id*. at 908-09. To require a true-up would eliminate this forward-looking requirement in favor of a backward-looking test and ignore the express language of the statute. *Id.* at 909. Another Texas court agreed that § 1191(c)(2)(A) requires only a prospective, not retroactive calculation of disposable income under the plan. *In re Nelkin & Nelkin P.C.,* 662 B.R. 550, 565-66 (Bankr. S.D. Tex. 2024). The court further concluded, however, that this prospective framework does not preclude the imposition of a true-up mechanism under §§ 1191(c) and 105(a) because the court is not limited to considering projected disposable income when considering what is fair and equitable. *Id*. at 566.[28]

This case presents a slightly different question. Creditors are not advocating for the inclusion of a true-up. Instead, they argue a true-up cannot replace the requirement that Debtor devote its projected disposable income under the Plan. On this point, the Court agrees.

There can be little doubt that a true-up provides added benefit to creditors by requiring Debtor to pay additional amounts if actual performance exceeds projections. Such a provision is also attractive, superficially, considering creditors have little or no recourse should a debtor out-perform projections.[29] Still, such a provision does not alleviate Debtor's statutory obligation to devote its projected disposable income to plan payments. This Court agrees with *Packet Construction* that requiring post-petition adjustment of plan payments would "read the word 'projected' out of the statute." 672 B.R. at 909. In interpreting a statute, "[T]he plain meaning of

---

[28] In *Packet Construction*, the court likewise concluded that use of the term "includes" in § 1191(c) allows for the inclusion of other factors in determining what is required for fair and equitable treatment, but expressed skepticism that circumstances could exist where a true-up would be required. 672 B.R. 905 at 914.
[29] Under § 1193, only a debtor may move to amend a confirmed plan.

legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (internal quotations omitted). A plain reading of the statute does not permit the Court to conclude that a true-up can cure a debtor's failure to reasonably estimate its projected disposable income in the first instance. The "projected disposable income" requirement under § 1191(c)(2)(A) is a baseline that must be met. A true-up provision may supplement this requirement by capturing additional income if debtor exceeds expectations, but it cannot substitute for, relax, or reduce this baseline requirement.[30]

Turning to the case at hand, Debtor's "Surplus Income" provision alone cannot satisfy the fair and equitable requirement of § 1191(b). First, § 1191(c) requires payment of projected disposable income, not a true-up, and second, the Surplus Income is only triggered if the Homeowners are not paid in full by insurance. With this limited application, the Surplus Income provision cannot satisfy any requirement to pay disposable income. Still, the Court finds that Debtor has met its burden under §1191(b) and § 1191(c)(2)(A), regardless of the Plan's "Surplus Income" provision. At trial, Debtor presented evidence to support its projections. Watkins testified that Debtor works six to eight ongoing construction projects at a time valued around $30 million total. Each project takes three to four years to complete and Debtor signs two or three new contracts each year. On average, Debtor collects about 20% of the overall construction costs as a builder's fee resulting in around $2 million a year in gross profit.

---

[30] True-ups still have a role to play in the confirmation process. Nothing prohibits a debtor from using a true-up as a negotiating tool to gain votes and achieve consensual confirmation. A true-up could be required in some circumstances using the authority found in § 105 coupled with § 1191(c). *See Packet Constr.,* 672 B.R. at 914-915; *Nelkin,* 662 B.R. at 566. The Court agrees that other factors may be considered in determining what is fair and equitable under the rules of construction set forth in § 1191(c), but is skeptical that a true-up could ever be required given the clear instruction to consider projected disposable income.

Creditors contend Debtor's projected disposable income is understated based on it's historical operations. Specifically, they argue Debtor's pre-petition pattern of entering into approximately two to three new contracts per year should generate significantly higher annual income. Creditors' argument, however, assumes each project pays in full within a year. Watkins' uncontroverted testimony shows the projects pay out over a period of three to four years. Creditors presented no evidence to contradict Watkins' projections which appear consistent with Debtor's performance in the monthly operating reports filed during this case.[31] Watkins further testified that the bankruptcy filing has affected Debtor's ability to obtain additional contracts because parties have questioned its ability to perform. Based on this evidence, the Court finds that Debtor's Plan devotes its projected disposable income over the life of the Plan as required by § 1191(c).

Creditors also object to a three-year plan term requesting the Court fix a longer term due to Debtor's unique business model and revenue cycle. Creditors assert the Plan does not fully capture Debtor's projected disposable income and pays too little to Class 3 creditors. The Court disagrees.

Section 1191(c)(2) requires the Plan provide for Debtor's projected disposable income "received in the 3-year period, or such longer period not to exceed 5 years as the court may fix." The Court has broad discretion in deciding whether to fix a term longer than three years to make the Plan fair and equitable. *In re Trinity Fam. Prac. & Urgent Care PLLC*, 661 B.R. 793, 821 (Bankr. W.D. Tex. 2024). Most courts agree that a three-year term is the default. *See Trinity Fam.*, 661 B.R. at 819 (language of § 1191(c) creates baseline plan term of three years); *In re Dark Rhiino Sec., Inc.*, Case No. 24-54658, 2026 WL 1020585, at *8 (Bankr. S.D. Ohio Apr. 13, 2026)(statute defaults to a three

---

[31] Doc. Nos. 61, 62, 81, 111.

year plan term); *In re Urgent Care Physicians, Ltd.*, Case No. 21-24000-beh, 2021 WL 6090985, at *10 (Bankr. E.D. Wis. Dec. 20, 2021) (describing three-year plan term as a default).

These courts disagree, however, on when it is appropriate to extend the three-year period. In *Urgent Care*, the court held three years was the default plan term absent "unusual circumstances." 2021 WL 6090985 at *10. The court in *Trinity* rejected the "unusual circumstances" test in favor of a totality of circumstances analysis utilizing five factors. 661 B.R. at 818, 822-23. The Court further ruled that when a party objects to the length of the plan, debtor bears the burden of establishing that the plan term is fair and equitable. 661 B.R. at 823. The court in *Dark Rhiino* agreed with a totality of circumstances analysis but rejected *Trinity's* conclusion that the debtor bears the burden to establish the period of plan payments as adding a requirement to the statute that does not exist. 2026 WL 1020585 at *8.

The Court agrees that a totality of the circumstances approach is appropriate and the factors cited in *Trinity* are useful for this purpose. However, the Court disagrees that the burden is on the debtor to supply evidence in support of the default plan length. While a debtor has the burden to establish a plan being confirmed under § 1191(b) is fair and equitable, the language of § 1191(c)(2)(A) tasks the Court with fixing a longer period when appropriate. Debtor's burden is to establish its devotion of projected disposable income over the life of the plan. The statute expressly provides that the term of the plan is three years unless the Court fixes a longer period. By providing the Court discretion and establishing three years as the default term of the plan, the statute gives no indication that debtor bears the burden of convincing the Court not to exercise its discretion to deviate from the default term. This Court declines to find that debtor bears the burden to prove the three-year default term is appropriate. These requirements do not change when an objection to the plan is made. Requiring a debtor to show that the three-year default period is appropriate is beyond the statute's

10

requirements. The Court concludes three years is the default. In certain circumstances and using its discretion, the Court may determine whether a longer period is required to make the plan fair and equitable.

Turning to the case at hand, the Court will consider the totality of circumstances utilizing the *Trinity* factors. These factors are neither exhaustive nor dispositive:

> i. Capital reserves or capital expenditures during the period of plan payments;
> ii. Reasonableness of income and expenses set forth in the plan projections during the period of plan payments as compared to historical operations and operations during the post-petition, pre-confirmation time period;
> iii. Salary and/or other payments to insiders during the period of plan payments;
> iv. Risks and consequences of a longer period of plan payments; and
> v. Any other unique or extraordinary facts specific to the case.

*Trinity Fam.*, 661 B.R. at 822.

Courts applying the *Trinity* factors or a "totality of circumstances" approach have declined to extend the plan beyond a three-year term for a variety of reasons. *See Matter of Edgewood Food Mart, Inc.*, 666 B.R. 418, 439-40 (Bankr. N.D. Ga. 2024)(court declined to extend term because debtor's principal made several concessions allowing creditors to receive more within a three year term); *In re Dark Rhiino Sec., Inc.*, Case No. 24-54658, 2026 WL 1020585, at *9-10 (Bankr. S.D. Ohio Apr. 13, 2026) (court declined to extend term because it could not find debtor had a reasonable likelihood to be able to make payments longer than a three-year period).

Applying the *Trinity* factors and considering the totality of circumstances, the Court does not find a longer plan term is warranted. The Projections show no capital reserve or capital expenditure during the proposed plan term. Debtor provided a reasonable estimate of its income and expenses during the plan term. Salaries during the plan term are likewise reasonable. Watkins testified at

confirmation that he anticipates a 2% annual increase in income and a 5% annual increase in health insurance expenses, both of which are reasonable assumptions. Insiders, Philip Kean and Bradley Grosberg, are not receiving compensation from the reorganized Debtor during the plan term. Further, Debtor's business model and revenue cycle are not unique, but instead customary for the construction industry.

The Court understands Creditors' position. Extending the plan term could provide additional recovery to all creditors. Creditors' argument here is based on a simple supposition that a longer period would result in more payments and hence a better recovery. This argument fails for several reasons. First, if this supposition were true here, it would be true in every case and always justify an extended plan term. Yet, as discussed, § 1191(c) is drafted to require three years as the default commitment period. Hence, the simple possibility of additional payments is not sufficient for the Court to extend a plan term. Further, based on the facts in this case, the Court cannot find a longer plan term will necessarily result in greater recovery. Debtor has market uncertainty similar to that present in *Dark Rhiino.* Watkins testified that the bankruptcy filing has negatively impacted Debtor's business, including causing Debtor to lose a potential $10 million contract. The Court finds that extending the plan term carries risks considering these business uncertainties. Accordingly, the Court finds that Debtor's three-year Plan meets the "fair and equitable" standard under § 1191(b), and no unusual circumstances exist that justify extending the plan term. Accordingly, Debtor has met its burden to satisfy the requirements for confirmation under § 1191(b).

In their initial objection, Creditors argued other bases to deny confirmation including, lack of good faith under § 1129(a)(3), lack of feasibility under § 1129(a)(11), and failure to satisfy the best interest of creditors test under §1129(a)(7). These arguments were not addressed at trial and likely abandoned, so the Court will address them briefly. Creditors' argument that Debtor's projections are

not feasible stands in direct contrast to the allegation that Debtor's projections are too conservative. Perhaps this is why this argument was not made at trial. "The feasibility test requires only a showing that the plan offers a reasonable assurance of success, not a guarantee of success." *In re New Midland Plaza Associates*, 247 B.R. 877, 884 (Bankr. S.D. Fla. 2000). Based on the evidence presented, the Court finds Debtor has met its burden under § 1129(a)(11). Debtor likewise has met its burden under the best interests of creditors test. Creditors argued that Debtor's liquidation analysis did not adequately account for cash on hand and accounts receivable. Watkins, however, testified that that those funds were being held in trust and earmarked for Debtor's ongoing construction projects.[32] Upon liquidation, those funds would be returned to the homeowners. Further, Debtor's accounts receivable along with its 50% interest in real estate are fully encumbered by over $3 million in liens held by Cogent Bank.[33] Finally, Creditors' argument regarding the lack of good faith is based simply on the other alleged failures in the Plan which have already been addressed. Creditors' remaining objections are likewise overruled.

### **Conclusion**

The Court finds that Debtor has met the requirements for confirmation of the Plan under §1191(b) including the requirement that the Plan is fair and equitable with respect to each impaired class that did not accept the Plan. For the reasons stated above, Creditors' Objection is overruled. The Court will enter a separate order confirming the Plan.

###

Attorney Daniel A. Velasquez is directed to serve a copy of this order on interested parties and file a proof of service within three (3) days of entry of the order.

---

[32] Debtor's Exh. 8. Watkins was available for cross-examination on the topics included in his Confirmation Affidavit.
[33] Debtor's Exhs. 5 and 6.